1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9

10   RESILIENT FLOOR COVERING      )
     PENSION FUND, et al.,          )
11                                  )        No. C08-5561 BZ
                  Plaintiff(s),     )
12                                  )
          v.                        )        **ORDER GRANTING**
13                                  )        **SUMMARY JUDGMENT**
     M & M INSTALLATION, INC.,      )
14   et al,                         )
                                    )
15                Defendant(s).     )
     _____)

16

17        On December 12, 2008, plaintiffs Resilient Floor Covering

18   Pension Fund and Board of Trustees of the Resilient Floor

19   Covering Pension Fund ("plaintiffs") filed suit against

20   defendants M & M Installation, Inc. ("M & M") and Simas Floor

21   Co., Inc. ("Simas Floor") (collectively "defendants") to

22   collect withdrawal liability in the amount of $2,414,228.00,

23   pursuant to the Employee Retirement Income Security Act

24   ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, as amended by the

25   Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA").[1]

26   _____

27        [1]   All parties have consented to my jurisdiction,
     including entry of final judgment, pursuant to 28 U.S.C.
     § 636(c) for all proceedings.  On June 29, 2009, by agreement
28   of the parties, plaintiffs filed a first amended complaint,

                                    1

1   Before the Court are the parties' cross motions for summary

2   judgment.

3       Plaintiffs seek summary judgment on three grounds,

4   asserting that Simas Floor is liable for M & M's withdrawal

5   liability because Simas Floor and M & M were "alter ego"

6   employers; because M & M wound up its operations and

7   transferred its business to Simas Floor with a principal

8   purpose of avoiding paying its withdrawal liability in

9   violation of 29 U.S.C. § 1392(c); and because Simas Floor is

10  the successor employer to M & M.  Defendants seek summary

11  judgment, arguing that Simas Floor is not liable for M & M's

12  withdrawal liability because Simas Floor is not an "employer"

13  within the meaning of the MPPAA, since it is neither under

14  "common control" with M & M, as defined under ERISA section

15  1301(b)(1), nor the "alter ego" or "successor" of M & M.

16  Simas Floor also seeks a declaratory judgment that a default

17  has not occurred within the meaning of 29 U.S.C.

18  § 1399(c)(5)(A)-(B) because it timely cured M & M's failure to

19  pay the June 2008 withdrawal liability payment and timely

20  requested review and arbitration of the Pension Fund's

21  determination that Simas Floor is liable for M & M's

22  withdrawal liability.  Finally, Simas Floor seeks a refund of

23  all withdrawal liability payments it made under protest, a

24  total of $219,726.32.

25  ///

26  ///

27  ————————————————————

28  which added one additional theory of withdrawal liability based
    on "successor liability."

2

1                    **FACTUAL BACKGROUND**[2]

2        It is undisputed that plaintiff Resilient Floor Covering

3   Pension Fund ("Pension Fund") is a trust fund established and

4   maintained pursuant to Section 302(c)(5) of the Labor

5   Management Relations Act of 1947, as amended, 29 U.S.C.

6   § 186(c)(5).  The Pension Fund is an employee benefit

7   plan within the meaning of Sections 3(2) and 3(3) of ERISA, 29

8   U.S.C. § 1002(2) and (3), and is maintained for the purpose of

9   providing retirement and related benefits to eligible

10  participants.  The Pension Fund is also a multiemployer

11  pension plan within the meaning of Section 2(37) of ERISA, 29

12  U.S.C. § 1002(37).  Plaintiff Members of the Board of

13  Trustees of the Resilient Floor Covering Pension Fund

14  ("Plaintiff Trustees") are fiduciaries within the meaning of

15  Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

16       Defendant Simas Floor is a non-union residential and

17  commercial flooring contractor, and a retailer of flooring

18  products, with offices in Sacramento, Stockton, and Visalia.

19  It was founded by Robert Simas in the 1950's.  In the early

20  1990's, Robert Simas left the company and sold his shares to

21  his three brothers, Ken, Jack and Dave Simas, leaving each of

22  them with an equal 33.33% interest.  Effective January 1,

23  2004, Ken, Jack and Dave Simas each transferred by gift and

24  _____

25       [2]     To the extent that the Court relies on any facts
    objected to by either party, those objections are **OVERRULED**.
26  Plaintiffs' unopposed request for judicial notice is **GRANTED**,
    to the extent of taking judicial notice of the fact that
27  appellate briefs have been filed by the parties in Case No.
    057688; not of the truth of the facts contained within those
28  briefs.

1   sale their shares to their respective children, Mark Simas,

2   Michelle Simas Carli, and Craig Simas, who now each own

3   33.33% of Simas Floor.  Mark Simas is Simas Floor's president

4   and Michele Simas Carli and Craig Simas are vice-presidents.

5   Along with their three fathers, the children also serve as

6   Simas Floor's directors.

7        Defendant M & M was formed on June 1, 1994 by Mark

8   Simas, as a residential flooring and tile contractor, which

9   operated out of Simas Floor's Sacramento facility.  According

10  to Mark Simas, M & M was created to serve as a union

11  signatory flooring contractor to allow non-union Simas Floor

12  to bid on union jobs by subcontracting the work to

13  M & M.   M & M entered into collective bargaining agreements

14  with Carpet, Resilient Flooring and Sign Workers Local Union

15  No. 1237 ("Local 1237"), which covered M & M's flooring

16  installers.[3]  These agreements required M & M to make

17  contributions to the Pension Fund on behalf of M & M's

18  flooring installers.

19       When M & M's collective bargaining agreement came up for

20  renegotiation in mid-2004, Painters District Council No. 16

21  ("District Council") had assumed control of Local 1237.

22  During the ensuing negotiations, the District Council

23  insisted that it would only sign a new collective bargaining

24  agreement if M & M agreed that the new agreement would also

25  cover Simas Floor's Sacramento flooring installers.  Since

27       [3]   M & M also employed tile setters, who were covered by
a different collective bargaining agreement than its flooring
28  installers.

4

1   Simas Floor did not want to become a union shop, M & M

2   refused to agree to the District Council's demands, which led

3   to an impasse in the negotiations and a strike by Local 1237

4   in July 2004.

5       After the strike, Mark Simas sent Local 1237 a letter

6   dated July 8, 2004 stating that M & M was withdrawing

7   recognition from the Union, effectively repudiating its

8   collective bargaining agreement.  M & M thereafter stopped

9   making contributions to the Pension Fund.

10      After withdrawing recognition from the Union, M & M and

11  the union agreed to allow M & M to complete some outstanding

12  jobs.  M & M finished those jobs with the approximately

13  twenty employees who returned to work after the strike, after

14  they had resigned from the union.  At the end of 2005, M & M

15  laid off its remaining flooring installers, two of whom were

16  hired by Simas Floor.

17      Around October 29, 2004, after it ceased to contribute

18  to the Pension Fund, M & M received notice from the Pension

19  Fund that M & M had been assessed a $2,414,228.00 withdrawal

20  liability, with quarterly payments of $43,945.20 due every

21  March, June, September, and December for a period of twenty

22  years.  Beginning in December of 2004 and through early 2008,

23  M & M made quarterly installment payments, using at least in

24  part Simas Floor's funds.  After operating solely as a union

25  tile setting contractor for approximately three years, M & M

26  shut down its operations and wound up its business on April

27  30, 2008, selling its only assets (three used work trucks) to

28  Simas Floor.  By letter dated June 27, 2008, M & M notified

1    the Pension Fund that it was going to stop making withdrawal
2    liability payments because it had "ceased operations" and
3    "wound up its affairs."
4        In a letter dated August 19, 2008, the Pension Fund
5    notified M & M that its June 2008 payment was delinquent and
6    demanded payment, contending that M & M was "still doing
7    business under the name of either M & M Installations or
8    Simas Floor Company" and that it "continues to be liable for
9    withdrawal liability."  M & M received the Pension Plan's
10   August 19, 2008 letter on September 8, 2008.  After some
11   negotiation, by letter dated November 6, 2008, Simas Floor
12   sent the Pension Fund the June 2008 quarterly withdrawal
13   liability payment, plus an additional amount representing
14   interest, under protest.
15       At the end of November 2008, Simas Floor, through its
16   attorney, wrote the Pension Fund requesting review in
17   accordance with MPPAA Section 4219(b)(2), 29 U.S.C. Section
18   1399(b)(2), in order to preserve Simas Floor's right to a
19   refund of the withdrawal liability amounts it had paid on
20   behalf of M & M.  On May 13, 2009, Simas Floor, again through
21   its attorney, requested arbitration of the Pension Fund's
22   determination that Simas Floor is liable for M & M's
23   withdrawal liability.
24       Simas Floor has now paid, under protest, M & M's
25   withdrawal liability payments for June 2008, September 2008,
26   December 2008, March 2009 and June 2009, a total of
27   $219,726.32.  Simas Floor now claims that it is entitled to
28   reimbursement of all payments made, and that it is not liable

1    for the balance of M & M's withdrawal liability.  The

2    parties' central dispute concerns whether Simas Floor is

3    responsible for the withdrawal liability incurred by M & M.

4                        **THE ALTER EGO DOCTRINE**

5         As a threshold issue, Simas Floor argues that it cannot

6    be held responsible for M & M's withdrawal liability because

7    it is not an "employer" within the meaning of the MPPAA, 29

8    U.S.C. § 1381.[4]  Both parties agree that whether Simas Floor

9    is an "employer" within the meaning of the MPPAA is a legal

10   issue to be resolved by the Court.  *See, e.g.*, Bowers on

11   behalf of NYSA-ILA Pension Trust Fund v. Transportacion

12   Maritima Mexicana, 901 F.2d 258 (2d Cir. 1990) (citing Korea

13   Shipping Corp. v. New York Shipping Ass'n-Int'l

14   Longshoremen's Ass'n Pension Trust Fund, 880 F.2d 1531, 1536

15   (2d Cir. 1989)).

16        Plaintiffs contend that Simas Floor is an "employer"

17   upon whom withdrawal liability should be imposed because

18   Simas Floor and M & M are "alter egos".[5]  A court may impose

---

[4]    Section 1381 states, in relevant part: "(a) If an
employer withdraws from a multiemployer plan in a complete
withdrawal or a partial withdrawal, then the employer is liable
to the plan in the amount determined under this part [29 USCS
§§ 1381 et seq.] to be the withdrawal liability."  29 U.S.C.
§ 1381(a).

[5]    The Ninth Circuit has noted that "it may be perfectly
legal for a contractor to conduct business through a 'double
breasted' operation, one in which the same contractor owns both
union and non-union companies for legitimate business purposes.
In such cases, the collective bargaining agreement of the union
firm does not ordinarily apply to the non-union firm.  Out of
concern, however, that some contractors would use
double-breasted operations to avoid their collective bargaining
obligations, the courts and the NLRB have developed two
conceptually related, but distinct theories - 'single employer'
and 'alter ego' - to guard against such abuse."  UA Local 343

1    pension fund liability upon a nonsignatory to a collective

2    bargaining agreement that is the "alter ego" of the

3    signatory. *See* <u>Massachusetts Carpenters Cent. Collection</u>

4    <u>Agency v. Belmont Concrete Corp.</u>, 139 F.3d 304, 307-08 (1st

5    Cir. 1998).  The party asserting the alter ego doctrine has

6    the burden of establishing it.  *See* <u>U.A. Local 373 v. Nor-Cal</u>

7    <u>Plumbing, Inc.</u>, 48 F.3d 1465, 1471 (9th Cir. 1994).

8       Defendants do not dispute that an employer found to be

9    the alter ego of another employer who has incurred withdrawal

10    liabilities may be responsible for the latter's withdrawal

11    liability.  Nor do defendants dispute the first half of the

12    alter ego doctrine - that there is sufficient common

13    ownership, common management, interrelation of operations,

14    and centralized control of labor relations between M & M and

15    Simas Floor to satisfy the commonality requirement of the

16    alter ego doctrine. (Def.'s Opp. p. 16:19-23.)  This is not

17    surprising, since it is undisputed that Simas Floor and M & M

18    had substantially identical ownership and management and that

19    Simas Floor formed M & M to allow Simas Floor to bid on union

20    jobs.  In fact, M & M had no source of business other than

21    from Simas Floor and no office staff.  The human resource

22    operations of M & M, including the hiring, disciplining, and

23    terminating of employees, were handled by Michelle Carli

24

25

26 of the United Ass'n of Journeymen & Apprentices of the United
<u>States and Canada, AFL-CIO</u>, 48 F.3d 1465, 1469 (9th Cir. 1994)
(citing <u>Carpenters' Local Union No. 1478 v. Stevens</u>, 743 F.2d

27 1271, 1275-77 (9th Cir. 1984), cert. denied, 471 U.S. 1015
(1985)).  Plaintiffs do not argue that Simas Floor and M & M

28 are a "single employer" operating under "common control."

Simas, who was paid by Simas Floor, not M & M.[6]  M & M
employees worked out of the Simas Floor location in
Sacramento and M & M did not pay Simas Floor for use of Simas
Floor's Sacramento office space.[7]  M & M had no phone line,
fax line, or website of its own.  All of the daily
administrative work of M & M was performed by Simas Floor
employees and staff, using Simas Floor's office and
equipment.  Simas Floor submitted all of M & M's bids and
billed customers for work performed by M & M.  M & M had no
written subcontracts with Simas Floor.  All the officers of
M & M received salaries from Simas Floor; not from M & M.
Simas Floor paid M & M only enough to cover M & M's overhead
and expenses, so M & M's net income was close to zero.  M & M
never distributed any profits to its shareholders.

     Instead of arguing that the commonality requirement of
the alter ego test has not been satisfied, defendants insist
that for Simas Floor to be found liable, plaintiff must prove
that M & M "was created by the union employer for the purpose
of evading the union employer's existing collective
bargaining obligations." (Def.'s Opp. p. 14:1-4.)  To
support this proposition, defendants cite to Nor-Cal, 48 F.3d
at 1470-1471, as well as a recent Ninth Circuit case,
Southern California Painters & Allied Trades, District

---

     [6]    Defendants' objections that this evidence is not
supported by the cited references provided by plaintiffs and
was taken out of context are **OVERRULED**.

     [7]    Defendants' objection that this evidence is not
supported by the cited references provided by plaintiffs is
**OVERRULED**.

1   Council No. 36 v. Rodin & Co, Inc., 558 F.3d 1028 (9th Cir.

2   2009), upon which defendants relied heavily during oral

3   argument.  Neither of these cases, however, involved pension

4   fund liability.[8]  What the Ninth Circuit said in Nor-Cal was

5   that the second half of the alter ego doctrine required the

6   union to show that the non-union employer "was being used in

7   a sham effort to avoid collective bargaining obligations."

8   Nor-Cal, 48 F.3d at 1470 (citing Brick Mason's Pension Trust

9   v. Industrial Fence & Supply, Inc., 839 F.2d 1333, 1336 (9th

10  Cir. 1988)).  The court then stated that to bind a non-union

11  employer to a collective bargaining agreement signed by an

12  affiliated union employer, the union would have to show that

13  the non-union employer was "created in 'an attempt to avoid

14  the obligations of [the union employer's] collective

15  bargaining agreement through a sham transaction or a

16  technical change in operations.'" Id. at 1472 (quoting A.

17  Dariano & Sons, Inc. v. District Council of Painters No. 33,

18  869 F.2d 514, 518 (9th Cir. 1989)).  In Rodin, the Ninth

19  Circuit refused to use the alter ego doctrine to impose a

20

21      [8]     Defendants also rely on CMSH Co. v. Carpenters Trust
    Fund, 963 F.2d 238 (9th Cir. 1992).  In 1978, CMSH Framing
22  "took over" CMSH's obligation under a collective bargaining
    agreement and CMSH ceased all union operations.  In 1980,
23  Congress passed the MPPAA which imposed liability on employers
    who withdrew from established pension plans.  In 1982, CMSH
24  framing did not renew its collective bargaining agreement and
    later dissolved itself and incurred withdrawal liability.  The
25  Ninth Circuit ruled that CMSH was not liable for CMSH Framing's
    withdrawal liability because CMSH had withdrawn from the
26  pension fund before the passage of the MPPAA at a time when
    there was no withdrawal liability.  The issue of retroactively
27  imposing withdrawal liability on firms which had withdrawn from
    pension funds prior to the enactment of the MPPAA is not
28  present here.

collective bargaining agreement on a non-union employer that had allegedly created a separate union employer, stating that "[t]he alter ego doctrine was never intended to coerce a non-union company into becoming a union company by requiring compliance with a collective bargaining agreement it never signed, with a union its employees never authorized to represent them."  Rodin, 558 F.3d at 1033.

    Here, plaintiffs are not a union; they are pension fund trustees.  Plaintiffs are not trying to turn Simas Floor into a union shop; they are simply trying to collect the pension fund liability which M & M incurred during its 10 years of operation.  In such a situation, the second half of the alter ego doctrine focuses not on the intent in creating the alter ego employer but on whether recognizing the separateness of the two employers undermines the purposes of ERISA and the MPPAA.[9]  As the First Circuit explained in Belmont:

> The alter ego doctrine is meant to prevent employers from evading their obligations under labor laws and collective bargaining agreements through the device of making "'a mere technical change in the structure or identity of the employing entity . . . without any substantial change in its ownership or management.'"
>
> Although developed in the labor law context, alter ego or successor liability analysis has been applied to claims involving employee benefit funds brought under ERISA and the LMRA. The rationale is that "an employer who evades his pension responsibilities gains an unearned advantage in his labor activities. Moreover, underlying congressional policy behind ERISA clearly favors the disregard of the corporate entity in cases where employees are denied their pension benefits."

_____

[9]    Unlike this case, in Rodin there was no evidence that the union employer used the non-union employer to avoid its union obligations or that the non-union employer benefitted from any arrangement it had with the union employer's labor force.  Rodin, 558 F.3d at 1033-34.

1

2
   In determining whether a nonsignatory employer is an
   alter ego of a signatory, we consider a variety of
3  factors, including continuity of ownership, similarity
   of the two companies in relation to management, business
   purpose, operation, equipment, customers, supervision,
4  and anti-union animus-i.e., "whether the alleged alter
   ego entity was created and maintained in order to avoid
5  labor obligations." No single factor is controlling, and
   all need not be present to support a finding of alter
6  ego status. In particular, there is no rule that
   wrongful motive is an essential element of a finding of
7  alter ego status.

8  139 F.3d at 307-308 (citations omitted).  More recently, the

9  First Circuit stated that the alter ego doctrine

10     is not a formalistic mechanism for reflexively regarding
       distinct jural entities' as legally interchangeable
11     whenever the entities' relationship is marked by a
       sufficient number of the doctrine's characteristic
12     criteria . . . . Rather, the doctrine is a *tool* to be
       employed when the corporate shield, if respected would
13     inequitably prevent a party from receiving what is
       otherwise due and owing from the person or persons who
14     have created the shield.

15 Massachusetts Carpenters Central Collection Agency v. A.A.

16 Building Erectors, Inc., 343 F.3d 18, 21-22 (1st Cir. 2003).

17 Other circuits generally agree.  "[A]lter-ego liability does

18 not arise from any particular statutory provision at all, but

19 rather from a general federal policy of piercing the

20 corporate veil when necessary to protect employee benefits."

21 *See* New York State Teamsters Conference Pension & Retirement

22 Fund v. Express Services, Inc., 426 F.3d 640, 647 (2d Cir.

23 2005) (citing Bd. of Trs. v. Foodtown, Inc., 296 F.3d 164,

24 169 (3d Cir. 2002); Lumpkin v. Envirodyne Indus., Inc., 933

25 F.2d 449, 460-61 (7th Cir. 1991)).  In a pension fund

26 liability case, the focus is less whether a union or non-

27 union employer was created for an improper purpose, and more

28 whether disregarding their separate entities is necessary to

12

1   protect employees' rights under ERISA and the MPPAA.

2        After reviewing the substantial undisputed evidence
3   presented by the parties about the manner in which Simas
4   Floor and M & M operated, I conclude that for purposes of
5   imposing pension fund withdrawal liability, plaintiffs have
6   established that Simas Floor and M & M were alter egos.   To
7   find otherwise would defeat the purpose of the alter ego
8   doctrine in the ERISA and MPPAA context.   It would permit
9   M & M to evade its obligations under ERISA and the collective
10  bargaining agreement.   It would result in M & M's former
11  employees being deprived of contributions towards their
12  pension benefits that they earned under the collective
13  bargaining agreement M & M signed.   It would also permit
14  Simas Floor to have gained an unearned advantage, allowing it
15  to keep the benefits of the profits it made from M & M's
16  union workforce without requiring it to bear the pension
17  responsibilities that work entailed.

18       The evidence that most troubles the Court is the way
19  Simas Floor controlled the cash that flowed through to M & M.
20  Simas Floor did not deal with M & M as an arms length
21  subcontractor; it merely provided M & M with sufficient funds
22  to pay operating expenses and overhead.   This meant that
23  Simas Floor controlled M & M's profits, and that
24  consequently, M & M would never have had sufficient funds to
25  pay the withdrawal liability unless those funds were provided
26  to it by Simas Floor.   The import of this ruling is to
27  require Simas Floor to do just that.   Having benefitted for
28  10 years from work performed by employees protected by union

1   collective bargaining agreements, Simas Floor should bear the

2   burden of completing the funding of their pension

3   entitlements.

4       For all the foregoing reasons, plaintiffs are **GRANTED**

5   summary judgment against Simas Floor on the grounds that

6   Simas Floor and M & M were alter ego employers.[10]

7                                   **DEFENDANTS' MOTION**

8       For the reasons plaintiffs are granted summary judgment,

9   defendants are **DENIED** summary judgment on their claim that

10  Simas Floor is not an employer within the meaning of the

11  MPPAA.[11]  This leaves defendants' motion for a declaratory

12  judgment that it is not in default under 29 U.S.C.

13  § 1399(c)(5)(A) or (B).

14      Plaintiffs argue that defendants are in default under

15  both sub-sections of section 1399 because defendants did not

16  timely submit M & M's September 2008 withdrawal liability

17  payment and because M & M's liabilities exceed its assets.

18      Section 1399(c)(5)(A) states that:

19      [i]n the event of a default, a plan sponsor may require
        immediate payment of the outstanding amount of an
20      employer's withdrawal liability, plus accrued interest
        on the total outstanding liability from the due date of
21      the first payment which was not timely made . . . the
        term "default" means . . . the failure of an employer to
22      make, when due, any payment under this section, if the
        failure is not cured within 60 days after the employer

23  _____

24       [10]    In view of this disposition I need not reach
    plaintiffs' alternative grounds for liability: a violation of
25  29 U.S.C. § 1392(c) and successor liability.

26       [11]    Defendants also sought a ruling that it and M & M are
    not under "common control" within the meaning of 29 U.S.C.
27  § 1301(b)(1).  This request is **DENIED** as moot, in view of the
    Court's ruling and the fact that plaintiffs did not seek relief
28  on this theory.

1      receives written notification from the plan sponsor of
       such failure . . . ."
2

3    29 U.S.C. § 1399(c)(5)(A).   The Supreme Court has stated

4    that:

5          [a] withdrawing employer's basic responsibility under
          the MPPAA is to make each withdrawal liability payment
6          when due. The Act thus establishes an installment
          obligation. Just as a pension plan cannot sue to recover
7          *any* withdrawal liability until the employer misses a
          scheduled payment, so too must the plan generally wait
8          until the employer misses a particular payment before
          suing to collect that payment.
9

10   <u>Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar</u>

11   <u>Corp.</u>, 522 U.S. 192, 208 (1997).

12         Here, plaintiffs did not send written notice to

13   defendants, as required by section 1399, of defendants'

14   failure to pay the September 2008 quarterly liability

15   payment.   Plaintiffs' August 18, 2008 letter demanding the

16   June 2008 payment was sent before defendants' September

17   installment payment was even due.   It did not provide

18   defendants with written notification of the default as to the

19   September payment.   Because defendants timely cured their

20   default of the June 2008 payment, plaintiffs' invocation of

21   the statutory acceleration provision was staved off.

22   Defendants never reinvoked it by making a written demand for

23   the September quarterly payment.

24         Plaintiffs assertion that defendants are in default

25   under section 1399(c)(5)(B) is equally unavailing.   Like

26   section 1399(c)(5)(A), section 1399(c)(5)(B) permits a plan

27   sponsor to accelerate payments upon "any other event defined

28   in rules adopted by the plan which indicates a substantial

1  likelihood that an employer will be unable to pay its

2  withdrawal liability."  Plaintiffs argue that under section

3  1399(c)(5)(B), defendants are in default because M & M's

4  liabilities exceed its assets.  Having found that defendant

5  Simas Floor is responsible for M & M's withdrawal liability,

6  I find that defendants' liabilities do not exceed their

7  assets, as plaintiffs have submitted no evidence that Simas

8  Floor is insolvent, delinquent on its current bills, or

9  otherwise defunct in its daily operations.

10      Defendants' motion for summary adjudication is not in

11  default under section 1399(c)(5)(A)-(B) is therefore **GRANTED**.

12      Judgment shall be entered accordingly.

13  Dated: August 17, 2009

14

15  _____

16              Bernard Zimmerman
         United States Magistrate Judge

17

18
g:\bzall\-bzcases\Resilient Floor Covering Pension\MSJ\Order on Cross Motions
19  for SJ V.2.BZ Version 2.wpd

20

21

22

23

24

25

26

27

28