1

2

3

4

5

6

7

8                 UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10

11  RESILIENT FLOOR COVERING        )
    PENSION FUND, et al.,           )
12                                  )        No. C08-5561 BZ
              Plaintiff(s),         )
13                                  )
         v.                         )   **ORDER ON CROSS-MOTIONS FOR**
14                                  )   **SUMMARY JUDGMENT**
    M & M INSTALLATION, INC.,       )
15  et al,                          )
                                    )
16            Defendant(s).         )
    _____)
17

18       This case is before me on remand from the Ninth Circuit

19  to resolve cross-motions for summary judgment.  The Circuit

20  "encouraged" me to consider whether Simas Floor is liable to

21  Plaintiffs under section 1392(c) of the MPPAA for engaging in

22  a transaction, a principal purpose of which was to "evade or

23  avoid" withdrawal liability.[1]  Resilient Floor Covering

24  Pension Fund, et al. v. M&M Installation, Inc., 630 F.3d 848,

25  855 (9th Cir. 2010).  The Circuit also instructed me to

26  _____

27       [1]   All parties have consented to my jurisdiction,
    including entry of final judgment, pursuant to 28 U.S.C.
28  § 636(c) for all proceedings.

1

determine whether "sections 1301(b)(1) and 1392(c) [of the
MPPAA] are the sole means for recovery of withdrawal liability
from companies related to the union signatory" and to "revisit
whether a triable issue of fact exists" regarding the second
element of the alter ego standard set forth in UA Local 343 v.
Nor-Cal Plumbing, Inc., 48 F.3d 1465 (9th Cir. 1994).  Id.
The parties have raised a few other issues, including veil
piercing and successor liability.

    The factual background of this case remains undisputed
and is set forth in detail in both my prior order (Resilient
Floor Covering Pension Fund v. M & M Installation, Inc., 651
F. Supp. 2d 1057 (N.D. Cal. 2009)), as well as in the Ninth
Circuit's order (630 F.3d 848), and will not be repeated here.
New, material facts introduced by the parties are noted
below.[2]

**LIABILITY UNDER SECTION 1392(c)**

    Section 1392(c) provides that "[i]f a principal purpose
of any transaction is to evade or avoid liability under this
part, this part shall be applied (and liability shall be
determined and collected) without regard to such transaction."
29 U.S.C. § 1392(c).  The term "purpose" is not defined in the
statute, and the Ninth Circuit has never construed this word
as used in this section.  The word must therefore be construed
in accordance with its ordinary and natural meaning, United
States v. Alvarez-Sanchez, 511 U.S. 350, 357 (1994); and "the
overall policies and objectives of the statute."  Brown v.

[2]    To the extent that the court relies on any facts
objected to by either party, those objections are **OVERRULED**.

2

1    <u>Gardner</u>, 513 U.S. 115, 117–19 (1994).

2         The noun "purpose" means "something one intends to get or

3    do; intention; aim," and the verb means "[t]o intend, resolve,

4    or plan."  Webster's New World Dictionary of the American

5    Language (2d ed. 1972).  Other courts that have confronted

6    this issue have determined that section 1392(c) requires

7    knowledge, intent or awareness of the withdrawal liability

8    before liability can be imposed under this section.  <u>See,</u>

9    <u>e.g.</u>, <u>SUPERVALU, Inc. v. Bd. of Trs. of the Southwestern Pa. &</u>

10   <u>W. Md. Area Teamsters & Emplrs. Pension Fund</u>, 500 F.3d 334,

11   341 (3d Cir. 2007) (stating that section 1392(c) requires

12   "intent" and that employers are prohibited from acting "in bad

13   faith"); <u>Santa Fe Pac. Corp. v. Central States, Southeast &</u>

14   <u>Southwest Areas Pension Fund</u>, 22 F.3d 725, 727 (7th Cir. 1994)

15   ("The issue is purpose, a state of mind inferred from

16   testimony and other evidence."); <u>I.L.G.W.U. Nat'l Retirement</u>

17   <u>Fund v. Edelman</u>, Case No. 92-4890, 1995 U.S. Dist. LEXIS 742,

18   WL 25912, at *10 (S.D.N.Y. Jan. 23, 1995) ("Without any

19   evidence that the Defendants . . . had access to knowledge

20   about a withdrawal liability, this Court cannot rule that, as

21   a matter of law, a principal purpose of the Defendants'

22   transfers was to avoid or evade withdrawal liability.");

23   <u>Chicago Truck Drivers, Helpers & Warehouse Workers Union</u>

24   <u>Pension Fund v. Zacek Indus., Inc.</u>, Case No. 92-2253, 1994

25   U.S. Dist. LEXIS 6483, WL 201042 (N.D. Ill. May 17,

26   1994)("ERISA provides that withdrawal liability shall be

27   determined without regard to transactions, which have as a

28   principal purpose the intent to evade or avoid such

                                   3

1  liability.").

2      Based on the plain language of the statute, and other

3  courts' interpretation of the term "purpose," it appears that

4  there is an intent or knowledge requirement, *i.e.*, that in

5  order to be found liable under this section, an employer must

6  have been aware of its withdrawal liability and must have

7  entered into a transaction, a principal purpose of which was

8  to evade or avoid the liability.  Put differently, this

9  section does not seem to apply to situations where an employer

10 engages in a transaction, *the effect* of which is to evade or

11 avoid withdrawal liability, unless the employer was aware of

12 its liability and factored that into its decision.

13     Here, there is no evidence that either Simas Floor or

14 M & M had the intent required by the statute.  All parties

15 agree that Simas Floor and M & M first became aware of M & M's

16 withdrawal liability in October 2004, when they received the

17 Pension Fund's notice.  Since neither Simas Floor nor M & M

18 knew of M & M's withdrawal liability until that time, no

19 transaction committed before then had a specific purpose of

20 evading that liability.  Nor have Plaintiffs provided evidence

21 of a transaction after October 2004 that Simas Floor or M & M

22 engaged in, a principal purpose of which was to avoid the

23 withdrawal liability.  Instead, as Simas Floor points out, M &

24 M paid the withdrawal liability for three and a half years

25 after it received the Pension's notice before winding up its

26 operations in April 2008.

27     In light of the undisputed evidence on the record,

28 Plaintiffs have failed to show that Simas Floor or M & M

1   engaged in a transaction, a principal purpose of which was to

2   evade or avoid M & M's withdrawal liability.  Accordingly,

3   Defendants' motion on Plaintiffs' section 1392(c) claim is

4   **GRANTED** and Plaintiffs' motion is **DENIED**.

5                **APPLICATION OF THE ALTER EGO DOCTRINE TO ERISA**

6        I turn next to whether sections 1301(b)(1) and 1392(c)

7   are the sole means for recovery of withdrawal liability from

8   companies related to the union signatory.[3]  If the answer is

9   yes, Simas Floor cannot be held responsible for M & M's

10  withdrawal liability under an "alter ego" theory.

11       A statutory remedy is the exclusive remedy for a

12  violation of that statute in two instances: (1) where Congress

13  expressly has stated it is the exclusive remedy; or (2) where

14  Congress has enacted such a comprehensive remedial scheme that

15  it clearly intended there be no other remedy.  See Golden

16  State Transit Corp. v. Los Angeles, 493 U.S. 103, 106-7

17  (1989).  The key to the inquiry is the intent of the

18  Legislature.  "We look first, of course, to the statutory

19  language, particularly to the provisions made therein for

20  enforcement and relief.  Then we review the legislative

21  history and other traditional aids of statutory interpretation

22  ────────────────

23       [3]  Defendants seek a declaration that they are not
     liable under under §1301(b)(1)'s "common control" theory, even
24   though Plaintiffs have never sought relief under this theory.
     Declaratory relief is discretionary by statute (28 U.S.C. §
25   2201(a)) and requires an actual controversy.  See, e.g., North
     County Communs. Corp. v. Cal. Catalog & Tech., 594 F.3d 1149,
26   1154 (9th Cir. 2010). Nonetheless, having been instructed to
     enter declaratory relief for Defendants on this theory, **I**
27   **DECLARE** that Simas Floor is not liable for M & M's withdrawal
     liability under section 1301(b)(1), since they are not under
28   common control, as that term is defined in that section.

1   to determine congressional intent." <u>Middlesex Cty. Sewerage</u>
2   <u>Auth. v. Sea Clammers</u>, 453 U.S. 1, 13 (1981).

3        Nothing in section 1392(c) explicitly states it is the
4   exclusive remedy, and Defendants do not so contend.[4]  When
5   Congress wants exclusivity, it knows how to draft such a
6   provision, as in section 1341 of ERISA, which states that a
7   plan "may be terminated only" in accordance with specified
8   subsections.  29 U.S.C. § 1341(a)(1), (b)(1).  Section 1392(c)
9   does not include such restrictive language.

10       Nor is there any evidence that Congress intended section
11  1392(c) to be an exclusive remedy when it enacted the MPPAA.
12  Congress enacted ERISA to protect employees' pension rights.
13  <u>Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz</u>
14  <u>Brewing Co.</u>, 513 U.S. 414, 416 (1995).  It repeatedly
15  recognized that it was promulgating "minimum standards" to
16  ensure "the equitable character of such plans and their
17  financial soundness."  29 U.S.C. § 1001 b(c)(3).  Finding that
18  ERISA "did not adequately protect plans from the adverse
19  consequences that resulted when individual employers
20  terminated their participation in, or withdrew from,
21  multiemployer plans," Congress then promulgated the MPPAA.
22  <u>Pension Benefit Guaranty Corp. v. R.A. Gray & Co.</u>, 467 U.S.

23  _____

24       [4]   As the Ninth Circuit noted, during the first round of
    summary judgment briefing, Defendants did not dispute that an
25  employer found to be the alter ego of another employer who has
    incurred withdrawal liability may be responsible for the
26  latter's withdrawal liability, and neither party raised the
    issue.  Now, Defendants seem to admit that some form of alter
27  ego liability exists, but they argue that Simas Floor is not
    liable for M & M's withdrawal liability because the alter ego
28  theory is not broad enough to apply to this situation.

717, 722 (1984); <u>Bay Area Laundry & Dry Cleaning Pension Trust</u>
<u>Fund v. Ferbar Corp.</u>, 522 U.S. 192, 196 (1997).  The MPPAA was
designed "(1) to protect the interests of participants and
beneficiaries in financially distressed multiemployer plans,
and (2) . . . to ensure benefit security to plan
participants."  H.R. Rep. No. 869, 96th Cong., 2d Sess. 71,
reprinted in 1980 U.S. Code Cong. & Ad. News 2918, 2939; <u>see</u>
<u>also</u> <u>Nat'l Shopmen Pension Fund v. Disa</u>, 583 F.Supp.2d 95, 99
(D.D.C. 2008) ("[T]he withdrawal liability payment requirement
generally protects the financial integrity of multiemployer
plans, prevents withdrawing employers from shifting their
burdens to remaining employers, and eliminates an incentive
for employers to flee underfunded pension plans.") (citing
<u>Milwaukee Brewery</u>, 513 U.S. at 416; <u>Connolly v. Pension</u>
<u>Benefit Guaranty Corp.</u>, 475 U.S. 211, 216 (1986); <u>R.A. Gray &</u>
<u>Co.</u>, 467 U.S. at 722-23).

     With these goals in mind, Congress can not have intended
section 1392(c) to be the "sole route of redress for evading
or avoiding withdrawal liability." <u>Resilient Floor</u>, 630 F.3d
at 851.  To begin, Congress permitted plan fiduciaries, such
as plaintiffs seeking to recover withdrawal liability, to
"bring an action for appropriate legal or equitable relief, or
both." 29 U.S.C. § 1451.  Nothing in this broad remedial
section suggests that Congress intended plan fiduciaries to be
limited to section 1392(c) as the "sole route of redress" in a
situation such as this.

     Second, as pointed out by Plaintiffs' counsel during the
hearing, the alter ego doctrine has been a part of the federal

common law governing employer-union relations for a long time.
In the context of labor disputes, the alter ego doctrine
developed to prevent employers from evading labor law
obligations merely by changing or altering their corporate
form.  See, e.g., Southport Petroleum Co. v. NLRB, 315 U.S.
100 (1942); Howard Johnson Co. v. Detroit Local Joint
Executive Bd., Hotel and Restaurant Employees, and Bartenders
Int'l Union, 417 U.S. 249, 259 n. 5 (1974); see also Goodman
Piping Products, Inc. v. NLRB, 741 F.2d 10 (2d Cir. 1984);
Iowa Express Distribution, Inc. v. NLRB, 739 F.2d 1305 (8th
Cir. 1984); NLRB v. Al Bryant, Inc., 711 F.2d 543 (3d Cir.
1983); Penntech Papers, Inc. v. NLRB, 706 F.2d 18 (1st Cir.
1983); Alkire v. NLRB, 716 F.2d 1014 (4th Cir. 1983); Nelson
Electric v. NLRB, 638 F.2d 965, 968 (6th Cir. 1981); NLRB v.
Tricor Products, Inc., 636 F.2d 266 (10th Cir. 1980); Seymour
v. Hull & Moreland Engineering, 605 F.2d 1105, 111-11 (9th
Cir. 1979).  Nothing in the MPPAA or in its legislative
history suggests that Congress intended to eliminate a long
recognized method of addressing sham employer entities which
undermine collective bargaining agreements.  In fact, Congress
"intended that the plan sponsor, the arbitrator, and the
courts follow the substance rather than the form of such
transactions in determining, assessing, and collecting
withdrawal liability." See 126 Cong. Rec. 23,038 (1980)
(statement of Rep. Frank Thompson).  If Congress wanted to
omit these theories of recovery from the statutory framework
of the MPPAA, it could have done so.  See Astoria Federal Sav.
and Loan Ass'n v. Solimino, 501 U.S. 104, 108 (1991)

1   ("Congress is understood to legislate against a background of

2   common-law adjudicatory principles.").

3       Third, when Congress enacted the MPPAA, it did not

4   include a definition of "employer" for purposes of a multi-

5   employer plan.[5]  Knowing that the courts had long applied the

6   alter ego and veil piercing doctrines in determining who was

7   an employer in various labor law contexts, it would be

8   incongruous to conclude that Congress intended to exclude that

9   body of law by failing to include a definition of employer in

10  the MPPAA.

11      The Supreme Court has not addressed whether alter ego or

12  veil piercing remedies are available to recover withdrawal

13  liability.  In the Court's only discussion of alter ego

14  liability or veil piercing under ERISA, it declined to decide

15  whether those remedies were permitted under the statute,

16  finding subject matter jurisdiction lacking "even if ERISA

17  permits a plaintiff to pierce the corporate veil to reach a

18  defendant not otherwise subject to suit under ERISA."  Peacock

19

20      [5]    The definition section of the MPPAA defines a
    "substantial employer" for purposes of a single-employer plan,
21  but does not define an employer, substantial or otherwise, for
    purposes of a multiemployer plan.  29 U.S.C. § 1301(a)(2).
22  Title I of ERISA contains a definition section that defines an
    employer, 29 U.S.C. 1002(5), but that section's definitions are
23  expressly limited to their own subchapter and do not apply to
    Title IV, which contains the MPPAA.  Mary Helen Coal Corp. v.
24  Hudson, 235 F.3d 207, 212 (4th Cir. 2000) (holding definition
    of "employer" in ERISA Title I inapplicable to Title IV); Korea
25  Shipping Corp. v. New York Shipping Ass'n-Int'l Longshoremen's
    Ass'n Pension Trust Fund, 880 F.2d 1531, 1536 (2d Cir. 1989)
26  (same, finding definition of an employer under MPPAA "must be
    left to the courts"); see also Nachman Corp. v. Pension Guar.
27  Benefit Bd., 446 U.S. 359, 370-71 (1980) (cautioning that the
    definitions in Title I are "not necessarily applicable to Title
28  IV").

1  v. Thomas, 516 U.S. 349, 354 (1996).  Nevertheless, with the

2  intent of Congress in mind, numerous courts which have

3  addressed alter ego and veil piercing theories in the context

4  of ERISA and MPPAA claims, have chosen to apply each doctrine.

5  See, e.g., Flynn v. R.C. Tile, 353 F.3d 953 (D.C. Cir. 2004)

6  (alter ego liability enables ERISA trustees to "recover

7  delinquent contributions from a sham entity used to circumvent

8  the participating employer's pension obligations."); Bd. of

9  Trs. v. Foodtown, Inc., 296 F.3d 164 (3d Cir. 2002)(reversing

10 dismissal of plaintiff's claims against alter ego for MPPAA

11 withdrawal liability);  Massachusetts Carpenters Central

12 Collection Agency v. Belmont Concrete Corp., 139 F.3d 304 (1st

13 Cir. 1998) (affirming summary judgment under the MPPAA

14 allowing plaintiffs to recover delinquent contributions to a

15 multiemployer pension plan from an alter ego); Lumpkin v.

16 Envirodyne Indus., 933 F.2d 449, 461 (7th Cir. 1991);

17 Upholsterers' Int'l Union Pension Fund v. Artistic Furniture

18 of Pontiac, 920 F.2d 1323 (7th Cir. 1990); United Steelworkers

19 v. Connors Steel Co., 847 F.2d 707 (11th Cir. 1988); Lowen v.

20 Tower Asset Mgmt., Inc., 829 F.2d 1209, 1220 (2d Cir. 1987);

21 see also, Brown v. Astro Holdings, Inc., 385 F. Supp. 2d 519

22 (E.D. Pa. 2005) (conducting analysis of congressional intent

23 of MPPAA and concluding that alter ego and veil piercing

24 theories permitted).[6]

25 ───────────
26        [6]    Numerous courts have recognized that an individual
   officer or director may be held personally liable for a
27 corporation's delinquent contributions if "piercing the
   corporate veil" or "alter ego" liability can be proven; or if
28 the individual defendant commits fraud, acts in concert with a
   fiduciary to breach a fiduciary obligation; or if the

1    While the Ninth Circuit has not addressed whether alter

2    ego and veil piercing theories are available under the MPPAA

3    for withdrawal liability, it has long allowed these remedies

4    in ERISA suits involving delinquent contributions. See

5    Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte

6    Clean-Up Service, Inc., 736 F.2d 516 (9th Cir. 1984); Hawaii

7    Carpenters Trust Funds v. Waiola Carpenter Shop, Inc., 823

8    F.2d 289 (9th Cir. 1987); Board of Trustees v. Valley Cabinet

9    & Mfg. Co., 877 F.2d 769 (9th Cir. 1989); Nor-Cal, 48 F.3d

10   1465; Trs. of the Screen Actors Guild-Producers Pension &

11   Health Plans v. NYCA, Inc., 572 F.3d 771, 776-77 (9th Cir.

12   2009).  These cases suggest that the Ninth Circuit would

13   likely apply the alter ego and veil piercing theories in a

14   withdrawal liability suit under the MPPAA.  Indeed the Ninth

15   Circuit recognized in this case that if there is a "concern"

16   that a double-breasted operation is being used to avoid

17   payment of withdrawal liability, the non-union company "may be

18   responsible as an alter ego employer for the union company's

19   withdrawal liability."  Resilient Floor, 630 F. 3d at 854.

20    Here, interpreting an "employer" subject to withdrawal

21   liability to include an "alter ego" of that employer accords

22   with federal common law and the purposes and policies behind

23   ERISA and the MPPAA.  Although developed in the context of the

24   _____

25   individual officer or director personally assumes the
     obligations of the company under the collective bargaining
26   agreement, thereby qualifying individually as an "employer"
     under ERISA.  See Blackburn v. Iversen, 925 F. Supp. 118, 123
27   (D. Conn. 1996) (collecting cases).

28

National Labor Relations Act, the alter ego and veil piercing doctrines have relevance in the ERISA context as well. Because Congress enacted ERISA to protect workers from their employers' attempts to deny them pension benefits, the underlying congressional policy behind ERISA clearly favors the disregard of the corporate entity in suits where employees are denied benefits as a result of sham transactions.  See, e.g., Pension Ben. Guaranty Corp. v. Ouimet Corp., 711 F.2d 1085 (1st. Cir. 1983); see also  Smith v. Cmta-Iam Pension Trust, 746 F.2d 587, 589 (9th Cir. 1984) (ERISA "is remedial legislation which should be liberally construed in favor of protecting participants in employee benefits plans.").  Given the broad remedial purpose of ERISA and the MPPAA, as well as the abundance of case law applying the alter ego doctrine to cases brought under ERISA and the MPPAA, I find its application appropriate in this case.

### APPLYING THE ALTER EGO DOCTRINE

The Ninth Circuit instructed me to revisit whether there is any material fact in dispute regarding the second element of the alter ego test as articulated in Nor-Cal.  "The Nor-Cal alter ego test requires proof (1) that the two firms have 'common ownership, management, operations, and labor relations,' and (2) that the non-union firm is used 'in a sham effort to avoid collective bargaining obligations.'" Resilient Floor, 630 F.3d at 851 (quoting Nor-Cal, 48 F.3d at 1470)).  Defendants have never disputed, and do not now dispute, that the first element of this test is satisfied. (Def.'s Opp. p. 27:5-8.)  Regarding the second element, the

Ninth Circuit has stated that "[u]nder the alter ego doctrine, the court considers the interrelation of operations, common management, centralized control of labor relations, and common ownership.  If these factors show that the transaction is a sham designed to avoid the obligations of a collective bargaining agreement, the nonsignatory employer will be bound."  <u>Gateway Structures, Inc. v. Carpenters 46 Northern California Counties Conference Bd. etc.</u>, 779 F.2d 485, 488 (9th Cir. 1985) (citing <u>Carpenters' Local Union No. 1478 v. Stevens</u>, 743 F.2d 1271, 1276-77 (9th Cir. 1984)); <u>see also</u> <u>A. Dariano & Sons, Inc. v. District Council of Painters No. 33</u>, 869 F.2d 514, 518 (9th Cir. 1989) ("The focus of the alter ego test, unlike the single employer test, is on the existence of a disguised continuance of the same business or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or a technical change in operations.").  Indeed, both parties agree that double-breasted operations — those in which the same contractor owns both union and non-union companies — are legal as long as they are not used to avoid collective bargaining obligations.  <u>Nor-Cal</u>, 48 F.3d at 1469-70.  But where a double-breasted operation is used to avoid payment of withdrawal liability, "then the non-union company may be responsible as an alter ego employer for the union company's withdrawal liability."  <u>Resilient Floor</u>, 650 F.3d at 854.  The "critical inquiry" is whether an employer is using a non-union company in a sham effort to avoid collective bargaining obligations.  <u>Stevens</u>, 743 F.2d at 1276 & n.6.

13

1    After reviewing the substantial undisputed evidence

2 presented by the parties about the manner in which Simas Floor

3 and M & M operated, I conclude that for purposes of imposing

4 pension fund withdrawal liability, Plaintiffs have established

5 that Simas Floor and M & M were alter egos since Simas Floor

6 operated M & M in such a manner to ensure that Simas Floor had

7 total control over whether M & M could meet its collective

8 bargaining obligations.  Plaintiffs produced undisputed

9 evidence that Simas Floor formed M & M to allow Simas Floor to

10 bid on union jobs, and that M & M had no source of business

11 other than from Simas Floor.  M & M received all of its

12 contracts and income from Simas Floor, and Simas Floor paid M

13 & M only enough to cover M & M's overhead and expenses, so

14 that M & M's net income was close to zero.  This meant that

15 M & M, controlled by Simas Floor, permitted Simas Floor to

16 take M & M's profits for Simas Floor's own use.  In this

17 manner, Simas Floor assured that M & M would never be in a

18 position to be able independently to meet its collective

19 bargaining obligations, be they paying contributions or

20 withdrawal liability.  Given the direction and flow of profits

21 that existed between these two companies, I find that this is

22 the type of double-breasted operation that the MPPAA was

23 implemented to prevent.  M & M's collective bargaining

24 obligations could only be met if Simas Floor funded them.

25 Simas Floor cannot now hide behind the collapse of M & M as

26 an excuse for avoiding the withdrawal liability that M & M

27 incurred.

28    For these reasons, Plaintiffs are **GRANTED** summary

1  judgment against Simas Floor on the grounds that Simas Floor
2  and M & M were alter ego employers.
3                          **VEIL PIERCING**
4       Plaintiffs next claim that the individual shareholders of
5  M & M should be held liable for M & M's withdrawal liability
6  under a veil piercing theory.  Both parties have moved for
7  summary adjudication of this claim.
8       Under federal common labor law, in deciding whether to
9  pierce the corporate veil, a reviewing court must consider
10  three factors: 1) the amount of respect given to the separate
11  identity of the corporation by its shareholders; 2) the degree
12  of injustice visited on the litigants by recognition of the
13  corporate entity, and 3) the fraudulent intent of the
14  incorporators.  <u>Seymour</u>, 605 F.2d at 1111.  The Ninth Circuit
15  articulated these three factors based on its review of "the
16  jumble of federal decisions" that had considered federal
17  substantive law on disregard of the corporate entity, noting
18  that "[f]ederal decisions naturally draw upon state law for
19  guidance in this field" and that "under different
20  circumstances" another rule might apply.  <u>Id.</u>  Plaintiffs must
21  prevail on the first threshold factor and on one of the other
22  two.  <u>See Board of Trustees v. Valley Cabinet & Mfg. Co.</u>, 877
23  F.2d 769, 773 (9th Cir. 1989).
24       Plaintiffs argue that the shareholders of M & M are
25  liable for the withdrawal liability because the assets of
26  Simas Floor and M & M were commingled.  There is no evidence
27  in the record, however, that the *shareholders* commingled their
28  personal assets with either M & M or Simas Floor.  While the

comingling of funds between corporations may be a factor in piercing the corporate veil of one of the corporations, Plaintiffs do not cite any authority for the proposition that the commingling of funds between two corporations is the type of "serious abuse" of the corporate identity that permits courts to pierce the veil of a corporation to reach its *shareholders*.  Instead, Plaintiffs cherry pick quotes from Associated Vendors, Inc. v. Oakland Meat Co., 210 Cal. App. 2d 825 (1962), wherein the court itemized a list of factors that various California courts have considered relevant for the purposes of determining whether to disregard the corporate structure.  (Pl.'s Reply Br. p. 11.)  None of the cases cited in Associated Vendors establishes that the shareholders, directors or officers of two corporations that are found to be a single entity can be held liable for the corporations' debts where there is no evidence that those individuals improperly commingled their assets with the corporations' assets.

Indeed, the authority cited by Plaintiffs involves situations where a plaintiff brought suit to hold an individual shareholder liable for having commingled his or her personal assets with that of the corporation.  Valley Cabinet & Mfg. Co., 877 F.2d at 772-73; Seymour, 605 F.2d at 1112. The other cases cited by Plaintiffs seem to hold that individual shareholders *cannot* be found liable just because there are two corporations acting as a single enterprise. See, e.g., Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Service, Inc., 736 F.2d 516, 523-524 (9th Cir. 1984) ("Uriarte Clean-Up does not appear to contest the

finding that it and Developers comprise a single enterprise. That finding permits the liabilities of Developers to be attributed to Uriarte Clean-Up and vice versa.  However, the stockholders cannot be held personally liable for the liabilities of the two corporations simply because they are engaged in a single enterprise."); <u>Arnold v. Browne</u>, 27 Cal. App. 3d 386, 396 (1972) (". . . the intermingling of the two corporations has no relevance to the liability of the individual defendants.); <u>see also</u> <u>Hollywood Cleaning & Pressing Co. v. Hollywood Laundry Service</u>, 217 Cal. 124 (1933).

Even given the import of this order — that Simas Floor and M & M are alter egos – there is still no basis to pierce either company's veil to hold its individual shareholders (the same former shareholders of M & M) liable for the withdrawal liability without evidence that the individual shareholders commingled their assets with that of the corporate entity. <u>Cf.</u> <u>Valley Cabinet</u>, 877 F.2d at 773.[7]

Plaintiffs also argue that the shareholders of M & M should be held responsible for its withdrawal liability because the evidence shows that M & M was undercapitalized from its inception.  Defendants deny that M & M was undercapitalized, and submit various tax documents and other evidence to show that M & M was adequately capitalized at its formation, with *inter alia*, $126,416 in shareholder equity,

---

[7]     Nor have Plaintiffs made any showing that, once Simas Floor has paid M & M's withdrawal liability, justice would require piercing either corporation's veil.

1    trucks, and a workers compensation bond.  (Def.'s Opp. Br.

2    19.)  Whether M & M was adequately capitalized presents a

3    disputed issue of fact, but having failed to make the

4    threshold showing under the first prong that M & M's

5    shareholders disregarded the corporate form through improper

6    commingling or other acts, the factual dispute over M & M's

7    undercapitalization is no longer material.[8]

8        I therefore find no basis to summarily adjudicate this

9    claim in Plaintiffs' favor, and, since Plaintiffs carry the

10   ultimate burden of persuasion on this claim and have failed to

11   carry their burden of production with respect to Defendants'

12   _____

13       [8]    Relying on state law, Plaintiffs argue that
     undercapitalization alone is sufficient to pierce the corporate
14   veil.  Under California law, the alter ego doctrine and the
     veil piercing doctrine are often conflated.  The two
15   requirements for application of either doctrine are (1) that
     there be such unity of interest and ownership that the separate
16   personalities of the corporation and the individual no longer
     exist and (2) that, if the acts are treated as those of the
17   corporation alone, an inequitable result will follow.
     Automotriz del Golfo de California S. A. de C. V. v. Resnick,
18   47 Cal.2d 792, 796 (1957) (citing H. A. S. Loan Service, Inc.
     v. McColgan, 21 Cal.2d 518, 523 (1943); Stark v. Coker, 20
19   Cal.2d 839, 846 (1942)).  Generally, however, inadequate
     capitalization is a factor that courts have considered under
20   the second prong.  See, e.g., Carlesimo v. Schwebel 87 Cal.
     App. 2d 482, 492 (1948) ("[W]e turn directly to the problem
21   here presented, namely, whether, as a matter of law, it should
     be held that this corporation was so under-financed that to
22   recognize the corporate entity would be to work a fraud on
     creditors of the company. There can be no doubt that the fact,
23   if such be the fact, that a corporation is organized with an
     obviously inadequate capital setup, such fact may be considered
24   in determining whether the corporate entity should be
     disregarded.").  But, even if analyzed under the first prong,
25   California courts have held that undercapitalization is only
     one of many factors that a court may consider, particularly
26   given that "The conditions under which the corporate entity may
     be disregarded, or the corporation be regarded as the alter ego
27   of the stockholders, necessarily vary according to the
     circumstances in each case inasmuch as the doctrine is
28   essentially an equitable one . . . ."  Stark, 20 Cal.2d at 846.

1  cross-motion, Defendants' motion is **GRANTED**.  See  Nissan Fire
2  & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir.
3  2000); Fairbank v. Wunderman Cato Johnson, 212 F.3d 528, 532
4  (9th Cir. 2000).

5  **SUCCESSOR LIABILITY**

6      Plaintiffs' final claim is for successor liability.
7  Under the "substantial continuity" test courts look to, *inter*
8  *alia*, the following factors: continuity of the workforce,
9  management, equipment and location; completion of work orders
10  begun by the predecessor; and constancy of customers.  See
11  Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 43
12  (1987).  "Continuity of work force is a major consideration in
13  successorship cases." Audit Services, Inc. v. Rolfson, 641
14  F.2d 757, 763 (9th Cir. 1981) (citing Howard Johnson Co. v.
15  Hotel Employees, 417 U.S. 249 (1974)).

16      The evidence on the record establishes that, for some
17  period of time after M & M's negotiations with the union broke
18  down, the union permitted Simas Floor to finish its then-
19  current projects for non-union wages.  After those projects
20  were completed, M & M laid off the flooring installation
21  employees who returned to work after the strike because M & M
22  and Simas Floor had no need for another non-union flooring
23  installation shop.  Only two (out of twelve) of M & M's former
24  flooring installers went to work for Simas Floor as flooring
25  installers.  Thereafter, Simas Floor stopped bidding on union
26  flooring installation jobs since it no longer had a collective
27  bargaining agreement with that union, and focused instead on
28  tile setting work because M & M's tile setters were still

19

1  covered by a collective bargaining agreement with a different

2  union.  M & M continued to perform tile setting work through

3  2008.  In April 2008, M & M wound up its affairs, including

4  selling its assets (three work trucks) to Simas Floor.  The

5  undisputed evidence demonstrates that there was not a

6  continuity in operations between M & M and Simas Floor

7  sufficient to find successor liability.  Accordingly,

8  Plaintiffs' motion is **DENIED** and Defendants' motion is

9  **GRANTED**.

10                         **CONCLUSION**

11      For the reasons stated above, **IT IS ORDERED** as follows:

12      1.  Defendants' motion on Plaintiffs' §1392(c) claim is

13  **GRANTED** and Plaintiffs' motion is **DENIED**.

14      2.  Defendants are **GRANTED** declaratory relief that Simas

15  Floor and M & M are not under common control.

16      3.  Plaintiffs' motion for summary judgment that Simas

17  Floor is liable for M & M's withdrawal liability as its alter

18  ego is **GRANTED** and Defendants' motion is **DENIED**.

19      4.  Defendants' motions for summary judgment on

20  Plaintiffs' veil piercing claim and successor liability claim

21  is **GRANTED** and Plaintiffs' motions are **DENIED**.

22      Judgment shall be entered accordingly.

23  Dated: February 29, 2012

25                    Bernard Zimmerman
                    United States Magistrate Judge

27  g:\bzall\-bzcases\Resilient Floor Covering Pension\MSJ\Order on Cross Motions for summary
    judgment after remand. bz version.3.wpd

                            20